**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| INTECH POWERCORE CORPORATION, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ALBERT HANDTMANN ELTEKA GMBH & CO. KG,<br>Defendant. | Civil Action No.: 14-05508<br><br>**OPINION** |

**CECCHI, District Judge.**

This matter comes before the Court on Defendant Albert Handtmann Elteka GmbH & Co. KG's ("Defendant" or "Elteka") motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1. ECF No. 58. Plaintiffs Intech Powercore Corporation and Intech Trading Corporation (collectively, "Plaintiff" or "Intech") filed an opposition (ECF No. 65), to which Defendant replied (ECF No. 70). The Court decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth below, Defendant's motion is granted in part and denied in part.

## I. <u>BACKGROUND</u>

### A. Factual Background

This action arises out of Defendant's alleged misappropriation of Plaintiff's proprietary information. Plaintiff claims that in or about 2012, Defendant obtained Plaintiff's confidential business information under the false pretense that it was interested in acquiring Plaintiff, which

Defendant then used to lure away Plaintiff's longtime customer, non-party Fanuc Robotics America, Inc. ("Fanuc"). ECF No. 65-28 ("Pl. Opp.") at 1; *see also* ECF No. 1 ("Compl.") ¶ 1.[1]

### 1. The Parties and the Fanuc Business

Plaintiff is comprised of Intech Powercore Corporation and Intech Trading Corporation, two New Jersey corporations that develop, design, and manufacture machine parts. DSMF ¶¶ 1–3. At all relevant times, Plaintiff's president was Georg Bartosch ("Bartosch"). Id. ¶ 4. Defendant is a German corporation that manufactured custom machine products for Plaintiff. Id. ¶¶ 5–7. Defendant is a subsidiary of the Handtmann Group ("Handtmann"), a German industrial conglomerate. Id. ¶ 5; *see also* Compl. ¶ 5. At all relevant times, Elteka's managing director was Joerg Vollmann ("Vollmann"). Id. ¶ 33.

From 2002 to 2013, Plaintiff designed and sold robotic arms to Fanuc, which Fanuc used in automobile-painting machines. DSMF ¶¶ 9, 17–18, 21. According to Plaintiff, there was a "handshake" agreement that Fanuc was exclusively Plaintiff's client. Id. ¶ 32. During the relevant period, Defendant did have some direct contact with Fanuc to discuss engineering matters; however, that contact was always coordinated by Plaintiff. PSMF ¶ 5.

To service Fanuc, Plaintiff initially designed molds of the robotic arms and ordered rough castings of the molds from Defendant. Id. ¶ 21. Plaintiff would then have Defendant's castings refined in the United States before it sold the finished products to Fanuc. Id. In or about 2005,

---

[1] Unless otherwise indicated, the background facts are drawn from the parties' Rule 56.1 statements of material facts. *See* Defendant's Rule 56.1 Statement of Undisputed Facts (ECF No. 58-1, "DSMF"); Plaintiff's Response to Defendant's Statement of Undisputed Facts (ECF No. 65-26, "PRSMF"); Plaintiff's Supplemental Statement of Additional Disputed Facts (ECF No. 65-27, "PSMF"); and Defendant's Response to Plaintiff's Supplemental Statement of Additional Disputed Facts (ECF No. 70-2, "DRSMF"). To the extent a party's responsive statement indicates only partial agreement to a factual assertion, the Court will either refer to only the agreed-upon facts or will explain the dispute. "[A]ny material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion." L. Civ. R. 56.1(a).

Defendant began manufacturing finished castings for Plaintiff, which Plaintiff then sold to Fanuc. Id. ¶ 23.  Since at least 2010, Plaintiff's pricing model for its Fanuc business involved adding an approximately 40% margin on the wholesale price it paid to Defendant. Id. ¶ 29.

### 2.  The Potential Transaction and Distribution Agreement

In April 2011, Defendant informed Plaintiff that its parent company, Handtmann, wanted to expand in the U.S. market. DSMF ¶ 37.  Plaintiff alleges that Handtmann had a "policy of not buying companies" and had actually given Defendant a "mandate" to circumvent Plaintiff and make direct sales to Fanuc. *See* PSMF ¶¶ 11, 14.  In response, Defendant maintains that there was no such "policy" or "mandate" and that Defendant actually sought to increase its U.S. sales by working together with Plaintiff. DRSMF ¶¶ 11, 14.  Defendant concedes, however, that "[i]t prefers to achieve growth internally and not by or through acquisitions."  Id. ¶ 14.

The following year, however, the parties began exploring a potential acquisition of Plaintiff by Defendant (the "Potential Transaction"). *See* DSMF ¶ 50.  On or about June 6, 2012, Vollmann met with Bartosch, Bartosch's son, and a consultant at the consultant's office in New Jersey to discuss the Potential Transaction.  Id. ¶ 41.  During the meeting, the parties executed a Confidentiality and Non-Disclosure Agreement ("NDA"), which included a provision governing the exchange of confidential information "in connection with the Potential Transaction." Id. ¶¶ 42, 50; PSMF ¶ 19; ECF No. 1, Ex. A at 1.  The NDA defined "Confidential Information" as "any and all technical, business, economic, financial, legal, operational and other information relating to the present and future businesses and affairs of [Intech]" that was provided to Elteka for "discussions regarding the Potential Transaction."[2]  ECF No. 1, Ex. A at 1.  By signing the NDA, Elteka agreed

---

[2] The NDA defined "Potential Transaction" as "a potential business transaction regarding [Intech]."  ECF No. 1, Ex. A at 1.

to "maintain the confidentiality of all Confidential Information it receives" from Intech and not "use . . . or otherwise exploit Confidential Information, except in furtherance of the Potential Transaction . . ." Id. at 2.  After the NDA was signed, Vollmann was given a document titled "Strategic Planning Output," which listed the revenues from Intech's businesses (including the Fanuc business) but did not include individual product pricing for the robotic arms. DSMF ¶¶ 43–44; PSMF ¶ 21.  Prior to the June 6, 2012 meeting, Vollmann did not know what Intech's revenue was on its Fanuc business.  Hart Dec., Ex. 2 (ECF No. 65-3), Vollmann Tr. at 118:4–8; PSMF ¶ 16.  At some point during the meeting, Vollmann announced that Elteka would not purchase Intech.  DSMF ¶¶ 48–49.  Bartosch then suggested that the parties enter into a distribution agreement.  Id. ¶ 49.

On August 3, 2012, Bartosch followed up with Vollmann on the proposed distribution agreement, and again mentioned an option for Defendant to buy Intech. Id. ¶ 52.  The following month, on September 6, 2012, the parties executed a letter of intent to negotiate a distribution agreement. Id. ¶ 56; Fischman Dec., Ex. 25 ("Sept. 6 Letter," ECF No. 58-27).  The letter stated that "[t]he Definitive Agreement . . . shall not be binding unless and until approved and executed by both of us."  DSMF ¶ 57.

Sometime thereafter, Plaintiff hired a technical sales group in California to assist with distribution, although the parties dispute whether Plaintiff took this action pursuant to the September 6 letter of intent. PSMF ¶ 36; DRSMF ¶ 36.[3] On October 2, 2012, Plaintiff sent Defendant a "final draft" of the distribution agreement for review, but the parties never fully executed that document or any other final agreement. DSMF ¶¶ 59–60, 70.

---

[3] The parties also attended, and shared costs for, a trade show in California in February 2013, but dispute whether these actions were taken pursuant to the September 6 letter of intent . PSMF ¶¶ 36–37; DRSMF ¶ 37.

3.   Plaintiff's Continued Dealings with Fanuc and the Indefinite Postponement of the Distribution Agreement

In or about January 2013, Fanuc sought price reductions on the products it purchased from Plaintiff.  Id. ¶ 63; *see also* Hart Dec., Ex. 7 (ECF No. 65-13) at 1.  On January 31, 2013, Bartosch informed Vollmann by email that Fanuc was interested in a 17% price reduction.  Hart Dec., Ex. 7 (ECF No. 65-13) at 1.  Bartosch further noted that Intech had given Fanuc a 2% discount based on Elteka's representations that Intech would receive a 2% discount on the wholesale prices.  Id.

The following month, on February 17, 2013, Vollmann advised Bartosch by email that the parties' unsigned distribution agreement would be "postponed indefinitely."   DSMF ¶ 65; Hart Dec., Ex. 4(b) (ECF No. 65-6) at 13.[4]  Vollmann explained that by virtue of the postponement, Intech would lose its status as a "preferred customer," but it would not be disadvantaged with respect to order processing.[5]  Hart Dec., Ex. 4(b) (ECF No. 65-6) at 13.  He further noted that Elteka would be changing Intech's payment terms from 100 days to "'60 days net'" and would no longer discuss its American market plans with Intech.  Id.  Bartosch confirmed receipt of Vollmann's email on February 21, 2013 and promised to respond to it.  DSMF ¶ 66.

Bartosch responded by email dated March 11, 2013.  Fischman Dec., Ex. 31 (ECF No. 58-33) at 1.  In his email, Bartosch explained that he never sent Vollmann a signed copy of the distribution agreement because he "did not agree with the changes our lawyers made and was hoping to address those when we met next time."  Id.  Bartosch further stated that "[i]n our discussions you mention several alternatives how to secure a US business including taking away Fanuc form [sic] Intech and starting your own company.  These undoubtedly are alternative actions

---

[4]  Although the parties provided the Court with two different translations of the email, the translations appear to be similar in all material respects.
[5]  After Plaintiff lost its preferred customer status, it no longer received a 15% discount from Defendant.  *See* Hart Dec., Ex. 4(a) (ECF No. 65-5) at 17.

you can take."[6]  Id.  However, Bartosch noted, he "still believe[d] that the best alternative to grow

the US market is when we do it jointly . . ."  Id.

On April 26, 2013, Plaintiff proposed to Fanuc that the two establish a long-term supplier

agreement.  Fischman Dec., Ex. 32 (ECF No. 58-34) at 2.  A Fanuc representative responded on

April 29, 2013 that the company does not "sign agreements or contracts for purchases."  Id.[7]  At

his deposition, Bartosch testified that he did not have any contact with Fanuc after this email and

did "not recall asking anybody in [his] company to contact Fanuc in regard to this e-mail."

Bartosch Tr. 170:8-172:2.

### 4.  Defendant's Direct Contact with Fanuc

Defendant first contacted Fanuc about a direct relationship on June 11, 2013. Id. ¶ 71.  On

that day, Vollmann emailed a Fanuc representative that Elteka's "plan is to offer you our sales

prices directly."  Hart Dec., Ex. 8 (ECF No. 65-14) at 1.  Vollmann further noted that "Intech

wanted [Elteka] to reduce a part price of nearly 17% based on your RFQ" and that Elteka "do[es]

not know the prices between Intech and Fanuc."  Id.  Fanuc was receptive to a direct relationship

with Defendant and the opportunity to streamline the supply chain and realize cost savings.

Fischman Dec., Ex. 34 (ECF No. 58-36) at 2–3.  A week later, Fanuc told Defendant to expect a

meeting invitation for July 8 to discuss "the new arm and how orders will be processed through

[Defendant]." Fischman Dec., Ex. 35 (ECF No. 58-37) at 1.

After Defendant sent Fanuc price quotes on July 11, 2013, Fanuc informed Defendant that

the prices were actually higher than what it was currently paying Plaintiff. DSMF ¶ 78; Hart Dec.,

---

[6] In his declaration, Bartosch stated that he is "not a lawyer and was in no way suggesting [in his March 11, 2013 email] that such an action would be proper or legal."  Hart Decl., Ex. 25 (ECF No. 65-25) ¶ 25.

[7] Plaintiff previously proposed a long-term supply contract to Fanuc on July 16, 2012, but Fanuc was unable to enter into such a contract.  Fischman Dec., Ex. 26 (ECF No. 58-28) at 2.

Ex. 12 (ECF No. 65-18) at 2. In its response to Fanuc, Defendant made the following comments about Plaintiff's business:

> Based on the long term relationship we supported Intech with very good price and payment conditions. But as we are informed by Mr. Bartosch, Intech wanted to stay independent in the future. So Handtmann will see Intech as a normal customer with no strategic common discussions. An other important issue for us was, that we see no plan how it will go on with Intech in the future. Mr. Bartosch as owner is sales manager, production manager und logistic manager in one person. What will happen, if Mr. Bartosch could not do this from one day to the other. Tody Mihov could not do this and Alex Bartosch is no interested in that. We discussed this item several times. For Georg Bartosch would be this no problem and not necessary to discuss. But Intech has no regulations for such a worst case. In the in the next days we will prepare an offer with realistic prices. So normally Intech has to offer you also new prices. With these new prices we think there would be no price reduction according your target prices possible.

Hart Dec., Ex. 13 (ECF No. 65-19). At Fanuc's request, Defendant sent new price quotes on September 2, 2013; Defendant also told Fanuc that moving forward, Plaintiff would no longer receive a discount from Defendant and would have to increase Fanuc's prices, and that Fanuc should "rethink the better support in a direct business with [Defendant]." Hart Dec., Ex. 12 at 1. In October 2013, Defendant and Fanuc reached an agreement on price. Fischman Dec., Ex. 39 (ECF No. 58-41).

Plaintiff first learned that Fanuc was buying directly from Defendant in October 2013, when, after Plaintiff inquired about future orders, Fanuc replied that it thought Plaintiff was aware that it was now sourcing directly from Defendant, as Defendant had "requested that [Fanuc] make the change because of a change in [Plaintiff's] relationship with them." DSMF ¶ 83. Plaintiff never asked Fanuc what it had been told about Plaintiff's business, and Plaintiff did not attempt to sell to Fanuc after October 2013. Id. ¶¶ 83, 85; Bartosch Tr. at 41:12–18.

On or about November 26, 2013, Defendant decided not to pursue an acquisition of all or part of Intech. PSMF ¶ 74; Hart Dec., Ex. 6 (ECF No. 65-12) at Response to Interrogatory No. 9.

7

### B.      Procedural History

Plaintiff commenced this action against Defendant on September 3, 2014, alleging: (1) breach of the NDA; (2) fraud; (3) fraud in the inducement; (4) misappropriation of trade secrets under New Jersey's Trade Secrets Act, N.J.S.A. § 56:15-1, *et seq.*; (5) tortious interference with existing economic relationship; (6) tortious interference with prospective economic relationship; (7) trade libel; (8) unjust enrichment; and (9) breach of the distribution agreement. ECF No. 1. After the conclusion of discovery, Defendant moved for summary judgment on all nine counts. ECF No. 58-45 ("Def. MSJ").  Plaintiff filed an opposition to summary judgment. ECF No. 65-28 ("Pl. Opp."); ECF No. 73.  Defendant filed a reply. ECF No. 70 ("Def. Reply").  On December 14, 2020, the Court granted the parties' request to supplement their briefing with updated legal authority.  ECF No. 75.  The parties filed their supplemental submissions in January 2021.  ECF Nos. 76, 77.

## II.      **LEGAL STANDARD**

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *id.* (c) (requiring that assertions be supported by cites to the record, such as documents, depositions, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory responses, or other materials).  A fact is "material" if a dispute about that fact "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  On summary judgment, the Court views the facts in the light most favorable to the nonmoving party and determines whether there are genuine issues for trial. *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).  The movant bears the initial burden to prove the absence of genuine disputes of material fact. *Celotex Corp. v. Catrett*, 477

U.S. 317, 323 (1986).  Then the nonmoving party must "go beyond the pleadings" to identify specific facts showing that there are indeed genuine disputes for trial. *Id.* at 323–24; *Anderson*, 477 U.S. at 252 (requiring the opponent to present more than a "mere scintilla" of evidence).

## III.   <u>DISCUSSION</u>

### A.   **Breach of the Confidentiality and Non-Disclosure Agreement (Count I)**

In Count I, Plaintiff alleges that Defendant breached the NDA by using Plaintiff's confidential information to bypass Plaintiff "and induce Fanuc to purchase robotic arm parts directly from Elteka." ECF No. 1 ¶ 65.  Defendant argues that it is entitled to summary judgment on this count because there is no evidence that the June 2012 Strategic Planning Output document revealed confidential information covered by the NDA. Def. Reply at 3–4.   Furthermore, Defendant argues, it did not use any of the information from the Strategic Planning Output document when it contacted Fanuc about a direct relationship in June 2013. Id.  Finally, Defendant asserts that Plaintiff is improperly attempting to expand the scope of the NDA in order to include later information exchanges, such as Plaintiff's January 2013 email which mentioned Fanuc's request for a 17% price reduction. Id. at 4.

To establish a claim for breach of contract, a plaintiff must show:  (1) the existence of a valid contract; (2) a breach of that contract; (3) resulting damages; and (4) that the plaintiff performed its own contractual obligations. *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007).  The parties do not dispute that the NDA is a valid contract.  Plaintiff argues that Defendant breached the NDA by using Plaintiff's confidential information to calculate Plaintiff's profits and then approached Fanuc with a lower price. Pl. Opp. at 14, 16–17.  As supporting evidence, Plaintiff cites Vollmann's testimony that he did not know Plaintiff's sales totals or profits on the Fanuc business before the June 6, 2012 meeting. Id. at 5; Vollmann Tr. at 96:5–97:18, 117:3–6, 118:4–8.  Plaintiff further asserts that there is no evidence showing that Defendant obtained pricing

information directly from Fanuc. Pl. Opp. at 16–17.  Finally, Plaintiff argues that the email it sent to Defendant mentioning that Fanuc had requested a 17% price reduction was covered by the NDA because Defendant was still negotiating the Potential Transaction in January 2013. Id. at 19, 26.

The Court finds that Plaintiff has raised triable issues of fact which preclude summary judgment on its claim for breach of the NDA.  Specifically, the parties dispute whether the Strategic Planning Output document revealed confidential information governed by the NDA, whether Fanuc's price reduction request fell within the purview of the NDA, and whether Defendant ultimately used such information in its dealings with Fanuc.  The Court cannot say that there is no genuine issue of material fact for trial in view of the NDA's broad definition of "Confidential Information," which includes "any and all technical, business, economic, financial, legal, operational and other information relating to the present and future businesses and affairs of [Intech]," ECF No. 1, Ex. A at 1, as well as Vollmann's concession that he did not know Intech's revenues before the June 6, 2012 meeting, Vollmann's reference to the 17% price reduction request in his June 11, 2013 email to a Fanuc representative, Elteka's representation that it decided on or about November 26, 2013 not to pursue an acquisition of Intech, and the fact that Elteka later secured a direct sales relationship with Fanuc.  Thus, because factual disputes remain on the question of whether Defendant breached the NDA, Defendant is not entitled to summary judgment on Count I.

### B.    Fraud and Fraud in the Inducement (Counts II and III)

Count II alleges that Defendant committed fraud by misrepresenting its interest in purchasing Intech in order to convince Plaintiff to sign the NDA and share its confidential information. ECF No. 1 ¶ 68.  Count III alleges that Defendant committed fraud in the inducement by materially misrepresenting its interest in buying Intech, which Defendant knew was false, and that Plaintiff detrimentally relied on this misrepresentation. Id. ¶¶ 71–74.

In New Jersey, common-law fraud requires:  (1) a material misrepresentation of a past or present fact; (2) the defendant knows or believes the misrepresentation is false; (3)  the defendant intends that the other person will rely on the misrepresentation; (4) reasonable reliance thereon by that person; and (5) resulting damages. *Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 367 (N.J. 1997).  Fraud claims require proof by clear and convincing evidence. *Angrisani v. Capital Access Network, Inc.*, 175 F. App'x 554, 556 (3d Cir. 2006).  "Statements as to future or contingent events, as to expectations and probabilities, or as to what will be or is intended to be done in the future, do not constitute misrepresentations even though they turn out to be false, at least where they are not made with intent to deceive, and where the parties have equal means of knowledge." *Id.*  Although fraud can be committed by suggesting a falsity or by suppressing the truth, fraud by concealment requires more than silence or a failure to disclose known facts. *Copper Process Co v. Chi. Bonding & Ins. Co.*, 262 F. 66, 73 (3d Cir. 1920).  Under common law, a failure to reveal material information is only fraud where there is a duty to disclose. *United States v. Stackpole*, 64 F. App'x 842, 842 (3d Cir. 2003).

Defendant maintains that it sought Plaintiff's financial information only for the purpose of discussing the Potential Transaction and did not defraud Plaintiff to enter the NDA. Def. MSJ at 13.  Defendant argues that Plaintiff cannot present evidence to the contrary given the fact that Defendant wanted to work with Plaintiff. Def. Reply at 13.  Finally, Defendant avers that the parties did not have a special relationship which would require Defendant to disclose that it was pursuing direct sales to Fanuc. Id. at 14.  Plaintiff counters that Defendant committed fraud through its silence by withholding:   (a) the "mandate;" (b) the "policy" against acquisitions; and (c) Defendant's need for Plaintiff's information "to further its *documented* but *undisclosed* intent to steal the Fanuc business." Pl. Opp. at 27 (emphasis in original).  In support, Plaintiff points to

Vollmann's testimony about the 2011 "mandate" and whether he told Bartosch about it. Id. at 4–5; Vollmann Tr. at 464:11–16, 471:21–472:4.

The Court agrees with Defendant that any statements it made about buying Intech in the future did not constitute misrepresentations even though they turned out to be false. Nonetheless, the Court finds that a question of material fact remains as to whether Defendant's failure to disclose the "mandate" or its preference to achieve growth internally rather than through acquisitions constituted a material misrepresentation. The record indicates that at some point during the June 6, 2012 meeting, Bartosch gave Vollmann the Strategic Planning Output document, and Vollmann announced that Elteka would not purchase Intech. Bartosch further declared that had he had known of Defendant's alleged mandate and policy, he would never have entered into negotiations regarding the Potential Transaction, executed the NDA, or disclosed Intech's financial information to Defendant. Bartosch Dec. (Ex. 65-25) ¶¶ 14–15. As the record contains evidence that reveals a question of fact concerning whether Plaintiff relied on Defendant's stated interest in pursuing an acquisition to its detriment, Defendant is not entitled to summary judgment on Counts II or III.

### C.   Misappropriation of Trade Secrets under New Jersey's Trade Secrets Act, N.J.S.A. § 56:15-1, *et seq.* (Count IV)

In Count IV, Plaintiff alleges that it disclosed its trade secrets to Defendant for the sole purpose of the Potential Transaction, but that Defendant used and continues to use Plaintiff's trade secrets without authorization and in violation of the NDA. ECF No. 1 ¶¶ 77–80.

New Jersey's Trade Secrets Act, N.J.S.A. § 56:15-1, *et seq.* ("NJTSA"),[8] prohibits the actual or threatened misappropriation of a trade secret. *Id.* § 56:15-3. Accordingly, the first step

---

[8] Trade secret claims brought in federal court are governed by state law. *Merckle GmbH v. Johnson & Johnson*, 961 F. Supp. 721, 730 (D.N.J. 1997). While the complaint alleged trade secret misappropriation under NJTSA, Plaintiff's opposition makes reference to a "common law trade secret misappropriation" claim. Pl. Opp. at 18 n.14. Although Plaintiff cannot amend its complaint through its opposition papers, *Bell v. City of Phila.*, 275 F. App'x 157, 160 (3d Cir. 2008), the

in any trade secret case is to determine whether the information is "in fact, a trade secret." *Merckle*, 961 F. Supp. at 730.  NJTSA defines "trade secret" as information that derives economic value from being not known or readily ascertainable by others through proper means, and which the holder endeavors to keep confidential. N.J.S.A. § 56:15-2.  In assessing whether information is a trade secret, courts typically consult six factors:  (1) knowledge of the information outside the business; (2) knowledge of the information by employees and others in the business; (3) measures taken by the owner to keep the information secret; (4) the value of the information to the business and competitors; (5) the money or effort expended to develop the information; and (6) the ease or difficulty with which others could acquire or duplicate the information by proper means. *IDT Corp. v. Unlimited Recharge, Inc.*, No. 11-4992, 2011 WL 6020571, at *8 (D.N.J. Dec. 2, 2011) (citing *Ingersoll-Rand Co. v. Ciavatta*, 542 A.2d 879, 893 (N.J. 1988)).  Under the NJTSA, "[p]roper means" includes "discovery by reverse engineering."  N.J.S.A. § 56:15-2.

Defendant argues that it is entitled to summary judgment on Count IV because the Strategic Planning Output document did not disclose individual product pricing and because pricing and margin information are easily ascertainable, and thus not protectable trade secrets. Def. MSJ at 10–12 (citing *Touzot v. ROM Dev. Corp.*, No. 15-6289, 2016 WL 1688089, at *12 (D.N.J. Apr. 26, 2016)).  In *Touzot*, the plaintiff argued that its pricing and quality information were trade secrets, yet at the same time admitted that competitors could simply ask its clients for the information. 2016 WL 1688089, at *12.  The plaintiff further conceded that the defendant knew the identity of some of its customers, that it had shared customer pricing and quality information with the defendant, and that the parties did not have a non-compete or non-solicitation agreement. *Id.*  As

---

Court nonetheless addresses Plaintiff's contentions regarding common law misappropriation and finds that Plaintiff fails to satisfy the elements of such a claim.

a result, the court found that even if the defendant had not been in possession of the plaintiff's information, such information "was 'obtainable within normal business channels had [defendant] sought to do so.'" *Id.* (citation omitted).  Therefore, the court held that the information did not constitute a trade secret and that the plaintiff was unlikely to succeed on its misappropriation claim. *Id.* (adding that insofar as the defendant obtained the information unfairly and used it to its advantage without compensating the plaintiff, that was still insufficient to support a claim for trade secret misappropriation).

Defendant asserts that, like *Touzot*, Plaintiff's purported trade secrets were easily obtainable through normal business channels. Def. MSJ at 11–12; Def. Reply at 13.  Specifically, Defendant contends that Plaintiff's pricing information was not confidential as Plaintiff did not have a confidentiality agreement with Fanuc and Defendant could have asked its contacts at Fanuc for this information. Def. MSJ at 11.  Defendant also points out that, as the manufacturer of the Fanuc products, it knew Plaintiff's wholesale cost because it set that price, and Defendant could easily determine Plaintiff's profit margin "through simple deductive reasoning or 'reverse engineering.'" Id. at 11–12; Def. Reply at 11.  Plaintiff responds that profitability and pricing information are protectable trade secrets,[9] and argues that *Touzot* is distinguishable based on the facts of that case and because Defendant did not actually ask Fanuc what it paid Plaintiff. Pl. Opp. at 19–24.

---

[9] While courts in this district have found that "[c]ustomer lists, pricing information, and marketing techniques constitute trade secrets under New Jersey law," *Corp. Synergies Grp., LLC v. Andrews*, No. 18-13381, 2019 WL 3780098, at *4 (D.N.J. Aug. 12, 2019) (citing cases), the NJTSA requires any such trade secret to "derive[] economic value . . . from being not generally known to, and not being readily ascertainable by proper means by" others.  N.J.S.A. § 56:15-2.  Here, Plaintiff has not shown that information regarding its revenue and profitability could not have been acquired through proper means.

The Court finds the reasoning in *Touzot* applicable here.  First, Plaintiff did not have a confidentiality agreement with Fanuc, and in the absence of such an agreement, Fanuc was free to share its pricing information with Defendant.  Second, Defendant had some independent contact with Fanuc, such as meetings to discuss engineering. PRSMF ¶ 25.  Moreover, that Defendant had contacts at Fanuc is also shown by their email communications in 2013. *See, e.g.*, Fischman Dec., Ex. 37 (ECF No. 58-39).  Using these proper business channels, Defendant could have asked Fanuc what it paid Plaintiff.  Third, as the manufacturer, Defendant knew Plaintiff's wholesale cost, which it could use to calculate Plaintiff's profit margin.  Thus, as Defendant already knew the wholesale price, and could ask Fanuc for the product price, the Court is persuaded that Defendant could readily ascertain Plaintiff's profit margin through proper business channels.  Accordingly, there exists no genuine dispute of material fact to challenge the conclusion that Plaintiff's pricing and profit margin are not trade secrets.  As Plaintiff did not have a protectable trade secret, it follows that Defendant could not have misappropriated the same under NJTSA.  Defendant is therefore entitled to summary judgment on Count IV.

### D.   Tortious Interference with Existing and Prospective Economic Relationship (Counts V and VI)

Count V alleges that Defendant, who was aware of Plaintiff's existing relationship with Fanuc, wrongfully and intentionally interfered with this relationship to Plaintiff's detriment. ECF No. 1 ¶¶ 83–84.  Count VI alleges that Plaintiff additionally had a reasonable expectation of future economic benefit from Fanuc, which Defendant was aware of, yet wrongfully and intentionally interfered with, depriving Plaintiff of its anticipated economic benefit. Id. ¶ 87.

In New Jersey, a claim for tortious interference requires:  (1) an unjustified, intentional, and malicious interference, (2) with a current or prospective economic or contractual third-party

relationship, (3) which causes the loss of the prospective gain, and (4) resulting damages. *Angrisani*, 175 F. App'x at 557.

Defendant argues that Plaintiff cannot show that Defendant acted maliciously or that it used illegal or improper means to secure Fanuc's business, as the evidence shows instead that Defendant had a legitimate business motive to "cut out the middle man." Def. Reply at 16; Def. MSJ at 13.  Defendant also argues that Plaintiff did not have a reasonable expectation of business from Fanuc given that Fanuc twice rejected Plaintiff's proposal of a long-term supply agreement and because Plaintiff's president, Bartosch, testified that he had no contact with Fanuc after April 2013, which was "long before" Defendant contacted Fanuc in June 2013. Def. MSJ at 14.

Plaintiff argues that the record contains at least a triable issue of fact regarding whether Defendant acted with malice. Pl. Opp. at 30.  Plaintiff asserts that Defendant undermined Plaintiff's relationship with Fanuc by changing the terms of the Intech-Elteka relationship, and that Defendant's actions were designed to impede Plaintiff's cash flow, like when it raised the cost of materials and when it changed Plaintiff's payment terms. Id. at 34.  Plaintiff claims that Defendant then misstated to Fanuc that Plaintiff was aware of, and consented to, these changes. Id. at 31–32.  Plaintiff also argues that Defendant opined on Plaintiff's business in emails to Fanuc in August and September 2013 with the intent of undermining Fanuc's confidence in Plaintiff. Id. at 33.

The Court finds that a genuine dispute of material fact exists as to whether Defendant tortiously interfered with Plaintiff's economic relationship with Fanuc.  Contrary to Defendant's assertions, the record indicates that in January 2013, Defendant knew Plaintiff and Fanuc had continued their business relationship for at least some period in 2013.  See Hart Dec., Ex. 7 (ECF No. 65-13) at 1 (January 31, 2013 email from Bartosch to Vollmann regarding Intech's price

negotiations with Fanuc).  The following month, by email dated February 17, 2013, Vollmann advised Bartosch that Intech was losing its status as a preferred customer and shortened Intech's payment term.  Hart Dec., Ex. 4(b) (ECF No. 65-6) at 13.  When Vollmann began negotiating a sales relationship with Fanuc directly, he informed a Fanuc representative that Intech would lose its discount from Defendant, that Defendant "will not support Intech in the future with better price and payment conditions," and asked Fanuc to "rethink the better support in a direct business with Handtmann Elteka."  Hart Dec., Ex. 12 (ECF No. 65-18) at 1.  Then, on October 24, 2013, Vollmann informed Bartosch that Elteka and Fanuc were "striving for direct collaboration in the future" because "Fanuc saw business and technological advantages in the termination of [Intech and Elteka's] preferred business relationship."  Hart Dec., Ex. 4(d) (ECF No. 65-8) at ELT003704. When Bartosch asked Fanuc to send its "current forecast" the next day, a Fanuc representative noted that the company had begun sourcing directly from Elteka because Elteka "had contacted [Fanuc] and requested that [Fanuc] make the change because of a change in [Intech's] relationship with them."  Hart Dec., Ex. 11 (ECF No. 65-17).  On this record, a reasonable factfinder could conclude that by changing Intech's customer status and requesting that Fanuc shift its sourcing from Intech to Elteka, Defendant intentionally interfered with Intech's business relationship with Fanuc.  Thus, Defendant is not entitled to summary judgment on Counts V or VI.

### E.    Trade Libel (Count VII)

Count VII alleges that Defendant knowingly and maliciously made false statements about Plaintiff's business to Fanuc with the intent to convince Fanuc to stop placing orders with Plaintiff, and that these statements had their intended outcome and caused Plaintiff economic loss. ECF No. 1 ¶ 90.

Under New Jersey law, a claim for trade libel requires:  "(1) publication; (2) with malice; (3) of false allegations concerning [the plaintiff's] property, product, or business; and (4) special

damages, i.e., pecuniary harm." *Mayflower Transit, LLC v. Prince*, 314 F. Supp. 2d 362, 378 (D.N.J. 2004) (citations omitted) ("A [trade libel] plaintiff must show 'the publication of matter derogatory to [its] business in general of a kind calculated to prevent others from dealing with plaintiff or otherwise to disadvantageously interfere with [its] relations with others.'"); *see Patel v. Soriano*, 848 A.2d 803, 834 (N.J. Super. Ct. App. Div. 2004) ("The communication must be made to a third person and must play a material part in inducing others not to deal with plaintiff.").

Defendant argues that it did not make false or derogatory statements about Plaintiff, that it contacted Fanuc to secure new business, and that Fanuc decided to work with Defendant based solely on price. Def. MSJ at 14–15.  Plaintiff argues that Defendant knowingly, intentionally, and maliciously made false statements about Plaintiff's business to Fanuc. Pl. Opp. at 34–35 (citing emails wherein Defendant opined on Plaintiff's business); Hart Dec., Exs. 12, 13.

The Court finds that there are genuine disputes of material fact about whether Defendant's statements to Fanuc were knowingly false and whether those statements played a material part in Fanuc's decision to end its business relationship with Plaintiff, causing Plaintiff pecuniary harm. As best as the Court can discern from Plaintiff's limited briefing on the issue,[10] Plaintiff's trade libel claim rests primarily on Vollmann's August 2013 and September 2013 emails to Fanuc. See Pl. Opp. at 34–35.  In those emails, Vollmann discusses Plaintiff's business plans and capabilities, noting that Plaintiff would have "to requote" its prices to Fanuc once Plaintiff lost its preferred customer status. Hart Dec., Exs. 12, 13.  While the Court acknowledges that Vollmann testified that these statements merely represented his "personal opinion," see Vollmann Tr. 529:12-531:8, in view of the fact that Bartosch denies the veracity of those statements, see Bartosch Dec. ¶¶ 27-29, as well as Fanuc's representations to Bartosch that Fanuc began sourcing from Defendant

---

[10] Plaintiff dedicated only four cursory sentences to its trade libel claim.  See Pl. Opp. at 34–35.

directly after Defendant informed Fanuc about "a change in [Plaintiff's] relationship with [Defendant]," see DSMF ¶ 83, the Court finds that resolution of this claim will necessarily involve assessing the witnesses' credibility and weighing the evidence. As those functions fall within the province of the jury, the Court must deny summary judgment on Count VII. *See Boyle v. Cty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998) ("[A]t the summary judgment stage, a court may not weigh the evidence or make credibility determinations; these tasks are left to the fact-finder.") (internal citation omitted).

### F.    Unjust Enrichment (Count VIII)

In Count VIII, Plaintiff alleges that it conveyed proprietary designs and technical expertise for Fanuc's robotic arms to Defendant for manufacturing purposes, but that Defendant now uses the molds to sell robotic arms directly to Fanuc which unjustly enriches Defendant. ECF No. 1 ¶¶ 93–94.

"To establish unjust enrichment, a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust." *Amgro, Inc. v. Lincoln Gen. Ins. Co.*, 361 F. App'x 338, 346 n.10 (3d Cir. 2010) (quoting *VRG Corp. v. GKN Realty Corp.*, 641 A.2d 519, 526 (N.J. 1994)). Unjust enrichment is an equitable remedy, available only when there is no adequate remedy at law. *Dovale v. Marketsource, Inc.*, No. 05-2872, 2006 WL 2385099, at *7 (D.N.J. Aug. 17, 2006). Thus, a court will not impose this quasi-contractual liability when the claims at issue are governed by a valid contract. *Id.* at *8.

Defendant argues, in conclusory fashion, that it cannot be liable for unjust enrichment as any claim to ownership of the molds is governed by contracts in the form of purchase orders and invoices, although it does not articulate how those purchase orders and invoices govern Defendant's current use of the molds. Def. MSJ at 16. Defendant also asserts that it could not have received a benefit from the molds because it sold them to Plaintiff who then sold them to Fanuc at

a profit, and that even if the molds did confer a benefit, Plaintiff's claim is barred by New Jersey's six-year statute of limitations as the molds were made in 2002. Id.; *see* N.J.S.A. § 2A:14-1 ("Every action at law for . . . recovery upon a contractual claim or liability, express or implied, . . . shall be commenced within 6 years."). Plaintiff responds that its claim is not time-barred because the operative fact is that the molds are Intech's property and that as such, Defendant's current use of the molds, including molds purchased in 2011, unjustly enriches Defendant. Pl. Opp. at 39–40.[11] Plaintiff asserts that its claim is not barred as Intech is damaged by the current use of the molds. Id. at 40.

The Court finds that genuine issues of material fact preclude summary judgment on Plaintiff's unjust enrichment claim, including whether Defendant's retention of the molds was inequitable, and consequently, whether Defendant was unjustly enriched when it kept the molds and used them to continue manufacturing parts for Fanuc. As an initial matter, and contrary to Defendant's assertion, Plaintiff predicates its unjust enrichment claim on Defendant's current, not past, use of the molds in its business dealings with Fanuc. See Pl. Opp. at 40. Thus, Plaintiff's claim is not barred by the statute of limitations. Moreover, Defendant fails to sufficiently explain how the parties' past purchase orders and invoices cover Defendant's current use of the molds or how Defendant's continued use of the molds is equitable. Accordingly, because Defendant does not dispute that it continues to use the molds that Plaintiff allegedly created, the Court finds that it has not demonstrated the absence of a triable issue of fact. Thus, Defendant is not entitled to summary judgment on Count VIII.

---

[11] Plaintiff maintains that whether Fanuc paid Plaintiff for the design of the molds is immaterial. Pl. Opp. at 40. Elsewhere, Plaintiff explained that it retained title to the molds despite charging Fanuc for the design and cost, which is a common practice in the industry known as "tooling." PRSMF ¶ 18.

### G.        Breach of the Distribution Agreement (Count IX)

Finally, Count IX alleges that the parties' September 6, 2012 letter of intent was a binding distribution agreement, and that Defendant breached it by unilaterally terminating the agreement. ECF No. 1 ¶¶ 96–100.

"It is well settled that parties may effectively bind themselves by an informal memorandum where they agree upon the essential terms of the contract and intend to be bound by the memorandum, even though they contemplate the execution of a more formal document." *Berg Agency v. Sleepworld-Willingboro, Inc.*, 346 A.2d 419, 422 (N.J. Super. Ct. App. Div. 1975). "Whether the preliminary agreement is binding is a matter of the parties' intent." *Morales v. Santiago*, 526 A.2d 266, 269 (N.J. Super. Ct. App. Div. 1987) ("If the parties intend to be bound by their preliminary agreement and view the later written contract as merely a memorialization of their agreement, they are bound by the preliminary agreement.  On the other hand, if the parties intend that their preliminary agreement be subject to the terms of the later contract, they are not bound by their preliminary agreement."). In determining whether parties intended to be bound to a preliminary agreement, even without execution of a formal document, the Court considers the agreement's language, the circumstances of its preparation, and the parties' course of dealings before and after the document was prepared. *McBarron v. Kipling Woods LLC*, 838 A.2d 490, 491–92 (N.J. Super. Ct. App. Div. 2004).

Defendant argues that the letter of intent was not a binding contract because although the parties were negotiating a distribution agreement, Plaintiff never signed the final document. Def. MSJ at 17; Def. Reply at 19; Fischman Dec., Ex. 31.  Defendant also asserts that the parties' intent is clear as the letter states that the distribution agreement "shall be in form and substance acceptable to both of us, and shall not be binding unless and until approved and executed by both of us." Def. Reply at 19–20; Fischman Dec., Ex. 25.  Plaintiff counters that an enforceable contract arose from

the letter of intent because it contained all the material terms of an agreement and because the parties acted in conformity with its terms and considered it to be a binding distribution agreement. Pl. Opp. at 35–38.

The Court finds that summary judgment is not appropriate on Count IX as there are genuine disputes of material fact regarding the September 6 letter.  Specifically, questions remain as to the parties' intent to be bound by the letter, the extent to which they agreed on the essential terms of the agreement, and whether they acted in conformity with the letter as to show their belief that it was binding, despite the fact that they contemplated a later, more formal, document. *See McBarron*, 838 A.2d at 492.  Thus, as several genuine issues of material fact exist concerning the formation of the agreement and whether the parties discharged their responsibilities thereunder, Defendant is not entitled to summary judgment on Count IX.

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, Defendant's motion for summary judgment (ECF No. 58) is granted in part and denied in part.  Summary judgment is granted as to Count IV, and denied as to Counts I, II, III, V, VI, VII, VIII, and IX.  An appropriate Order accompanies this Opinion.

DATED:  March 24, 2021

_____
        **CLAIRE C. CECCHI, U.S.D.J.**